**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| GENCON INSURANCE COMPANY OF VERMONT,<br><br>                              Plaintiff,<br><br>v.<br><br>LEXINGTON INSURANCE COMPANY and EMPLOYERS REINSURANCE CORPORATION N/K/A WESTPORT INSURANCE CORPORATION,<br><br>                              Defendants. | **Civil Action No: 2:26-cv-25**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Gencon Insurance Company of Vermont ("Gencon"), a Vermont corporation, by its undersigned counsel, hereby submits its Complaint against Lexington Insurance Company ("Lexington") and Employers Reinsurance Corporation n/k/a Westport Insurance Corporation ("Westport") (a subsidiary of Swiss Re Corporate Solutions ("Swiss Re"), and together with Lexington, "Reinsurers"), and alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      Gencon is a captive insurance company that issued primary and excess general liability insurance policies providing insurance coverage to affiliated organizations within the Seventh-day Adventist Church (the "SDA Insureds") commencing in 1987 and continuing through the present.  The captive program ensures that insurance coverage is consistent across all ministries within the Seventh-day Adventist Church (the "Church") and crafted for the Church's specific needs.

2.      Gencon paid premium to purchase reinsurance from various reinsurance companies and ceded some of the risks it covers under the primary and excess general liability

policies to these reinsurance companies pursuant to treaty and facultative reinsurance
agreements.

3.     Gencon brings this action for breach of contract, breach of the implied duty of
good faith and fair dealing, and declaratory judgment against Lexington and Westport because
they, unlike other reinsurance companies in the Gencon program, have violated the terms of their
respective facultative reinsurance contracts with Gencon.

4.     Even though Lexington and Westport agreed that their liability would follow the
terms and conditions of the excess general liability policies (which incorporate the terms and
conditions of the Gencon primary general liability policies) Gencon issued for the policy periods
between July 1, 1999 and July 1, 2011, and that they would reimburse their cedent, Gencon,
upon proof of Gencon's payment of claims under the excess general liability policies, the
Reinsurers have improperly refused to indemnify Gencon for defense costs and settlements that
Gencon has paid, and which it will continue to incur and pay, for bodily injury claims against
certain SDA Insureds under these policies.

5.     The bodily injury claims have been brought by former students of a boarding
school in West Virginia, the Miracle Meadows School ("Miracle Meadows").  Miracle Meadows
advertised itself as an "alternative" school for "difficult" students who, for the most part, were
unable to continue enrollment in the schools owned and operated by the Church.  While certain
members of the Church owned Miracle Meadows, the school was not an official ministry of the
Church, and it was neither sanctioned by the Church nor part of the Church's education system.

6.     The former students alleged that they were subjected to abhorrent living
conditions while attending Miracle Meadows, including, physical and mental abuse,
malnutrition, educational and medical neglect, false imprisonment, quarantine for days or even

2

months in window-less rooms with a coffee can for a toilet and bare floors as bedding, being

handcuffed or shackled to trees or poles or tethered together, violation of child labor laws,

including working in extreme weather without adequate clothing, and being regularly denigrated

and humiliated.  Many claimants alleged that they were the victims of sexual misconduct,

although they did not allege sexual misconduct or any direct physical abuse by any employee of

an SDA Insured (and many of the sexual misconduct allegations could not be supported at

deposition).  Instead, the claimants alleged both vicarious and derivative liability, as well as

independent, non-derivative negligent acts against the SDA Insureds, including lack of due

diligence, the failure to protect students from barbaric living conditions throughout each

academic year, and actual or constructive knowledge of the wrongdoing at the school (the

"Miracle Meadows Claims").

    7.    The Miracle Meadow Claims were tendered to Adventist Risk Management, Inc.

("ARM"), the claims administrator for Gencon.[1]  ARM determined that non-sexual physical

abuse allegations in the Miracle Meadows Claims triggered the duty to defend under the Gencon

general liability policies and that no exclusions precluded coverage, and, therefore, retained

underlying defense counsel and paid for the SDA Insureds' defense.

    8.    In 2020, an opportunity arose to settle the initial twenty-seven (27) claims,

although claimants' counsel would only settle the claims globally.  Faced with a significant risk

of a runaway jury verdict if any claim proceeded to trial, and upon underlying defense counsel's

recommendation, ARM, on behalf of the SDA Insureds, settled these initial claims for $19

million, with individual claimants receiving between $500,000 and $1 million each.

---

[1]    ARM is the official insurance and risk management company for the Church and Adventist ministries around
the world. ARM also is the administrative entity set up and operated by the General Conference of Seventh-day
Adventists that operates Gencon.

9.    Additional former students subsequently tendered claims against the SDA Insureds that all alleged bodily injuries primarily from non-sexual physical abuse and inhumane living conditions, as well as sexual misconduct.  ARM settled these additional claims in various batches or "rounds" for amounts between $450,000 and $650,000 each.  To date, defense costs for the Miracle Meadows Claims total over $2 million and one hundred seventy-seven (177) cases have settled for over $86.6 million in total.  Of that amount, ARM has billed $36,439,052.90 to Lexington and $19,002,272.74 to Westport that Gencon has paid for the Miracle Meadows Claims under the Gencon policies that these Reinsurers have not reimbursed.

10.    Gencon paid each of the settlements and defense costs on behalf of the SDA Insureds because underlying defense counsel's investigation and discovery in the underlying cases confirmed the existence of the abhorrent living conditions and wide-ranging non-sexual physical abuse.  Additionally, the theories of liability against the SDA Insureds sounded in negligence, triggering coverage under the Gencon general liability policies covering the SDA Insureds, and further concluded that no exclusions applied to preclude coverage for the claims entirely.

11.    For purposes of reinsurance, Gencon initially allocated the loss from the first settlement of twenty-seven (27) Miracle Meadows Claims to the three policy years that involved the most egregious injuries.  Gencon then billed the reinsurance companies that reinsured the excess policies in those three years – which did not include Westport, but which did include two years of Lexington's facultative reinsurance.  A number of reinsurance companies paid under this methodology.

12.    But ARM determined that this methodology was not appropriate in light of the complexity and number of claims that were starting to emerge and was inconsistent with the

4

language of the contracts. Therefore, ARM revised its methodology to allocate claims within each subsequent settlement round based on the first year of attendance of the new claimants, because plaintiffs could not recall specific instances of abuse and Miracle Meadows's records were incomplete, but plaintiffs were exposed to the abhorrent living conditions upon arrival at the school and throughout each academic year.

13.    ARM again revised its allocation methodology in consideration of and in response to inquiries from certain reinsurance companies, including Lexington, based on a better understanding of the nature of the claims. The revised allocation retained the allocation based on the first year of attendance, but no longer artificially separated loss allocation based on settlement rounds. Consequently, Gencon opened nineteen (19) reinsurance claims – one for each year that Miracle Meadows operated – and placed each claimant into a claim year based on the claimant's first date of attendance. It then aggregated the loss allocations by claim year such that in any claim year where the aggregated allocated loss is greater than the $1 million in primary general liability policy limits, the Gencon excess policies are triggered.

14.    ARM's handling of the Miracle Meadows Claims and allocation to the respective reinsurers, including Lexington and Westport, was reasonable, justified, and prudent in light of the number and nature of the claims, the widespread and severe allegations of non-sexual physical abuse, and the applicable policy language. ARM made its coverage determinations and settled the Miracle Meadows Claims based on the guidance of experienced outside counsel and well-qualified claims handlers to avoid the real possibility of liability findings and nuclear jury verdicts against the SDA Insureds, as well as the possibility of bad faith conduct vis-à-vis its insureds if it had failed to pay covered claims within policy limits. Even if another allocation

also was reasonable, industry custom and practice permits Gencon to select any reasonable allocation it finds favorable.

15.    In no way did ARM settle the Miracle Meadows Claims and make the indemnity payments based on collusion, fraud, or bad faith.  And rebooking complex claims, including revising allocations, as more information becomes available and in response to reinsurer inquiries, is a regular, accepted practice in reinsurance.  The revised allocation methodology based on the first date of attendance and the continuous inhumane conditions each academic year is reasonable in light of the nature of the harm, the available evidence in the underlying claims, and the applicable policy language.

16.    Yet, the Reinsurers, despite their obligation under their respective facultative reinsurance contracts and in accordance with industry custom and practice, to follow Gencon's reasonable determinations regarding settlement of claims, have refused to reimburse Gencon for the defense and settlement costs it paid.  Instead, they argue that: (1) even though the Miracle Meadows Claims primarily are for non-sexual physical abuse, the claims should have been handled under Gencon's claims-made employment practices and sexual misconduct liability ("EPL") policies, not Gencon's general liability ("GL") occurrence policies (even though the EPL policies expressly exclude coverage if the GL policies could apply); and therefore that (2) sexual misconduct exclusions in Gencon's excess policies preclude coverage for the claims (even though those exclusions only apply to claims handled under the EPL policies and are otherwise inapplicable); (3) any portion of the settlements for the "civil conspiracy" causes of action are not covered (even though the settlement amounts were reasonable regardless); and (4) Gencon's loss allocation is improper.

17.     Gencon asserts that the Reinsurers have breached the terms of their facultative reinsurance agreements and their duty of good faith and fair dealing and are obligated to reimburse Gencon for the amounts that it has paid to defend and settle the Miracle Meadows Claims against the SDA Insureds that were handled reasonably and paid under the Gencon GL policies and that were reasonably and properly allocated.

## PARTIES

18.     Plaintiff Gencon Insurance Company of Vermont is a captive insurance company, a tax-exempt 501(c)(3) organization, and a wholly-owned subsidiary of the General Conference Corporation of Seventh-day Adventists.  Gencon is a citizen of Vermont, with a principal place of business in Burlington, Vermont.

19.     Upon information and belief, Defendant Lexington Insurance Company is a Delaware corporation with a principal place of business in Boston, Massachusetts.  Upon information and belief, Lexington is a subsidiary of American Internation Group.

20.     Upon information and belief, Defendant Employers Reinsurance Corporation n/k/a Westport Insurance Corporation is a Missouri corporation with a principal place of business in St. Louis, Missouri.  Upon information and belief, Westport is a subsidiary of Swiss Re.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction under § 1332(a) of Title 28 of the United States Code because there is complete diversity among the parties and the amount in controversy exceeds $75,000.00 exclusive of costs and interest.

22.     An actual controversy exists between Gencon on the one hand and both Lexington and Westport on the other hand because Lexington and Westport dispute the amounts each owes Gencon for the costs of defending against and settling the Miracle Meadows Claims.  Thus, this

7

Court has jurisdiction over Gencon's claims for declaratory relief under § 2201 of Title 28 of the United States Code because an actual controversy ripe for judicial determination exists between Gencon and Lexington and Westport.

23.     Venue is proper within this judicial district under § 1391 of Title 28 of the United States Code because Gencon is located in this judicial district, because the reinsurance contracts at issue were sold to Gencon in Vermont, and because Lexington and Westport generally transact business in this district and within the State of Vermont.

## FACTUAL BACKGROUND

### A.    The Seventh-day Adventist Church.

24.     In 1863, the Church officially organized into a denomination with approximately 3,500 members across 125 churches.  The Church is one of the fastest growing Christian Protestant churches in the world, with a membership of over 22 million members.  It operates one of the largest parochial education systems in the world, and it is one of the largest non-profit and religious networks in the United States.

25.     The Church includes layers of organization that serve successively greater geographic territory.  Local churches serve as the constituency for local Adventist schools. Groups of churches in a region are organized into a conference; the local conferences own and operate the SDA schools and employ all personnel of affiliated schools and assist with school curriculum.  A group of conferences are organized into larger groups of Union Conferences. Each Union Conference oversees the accreditation of schools.  The General Conference, in turn, coordinates the mission of the worldwide Church.  Divisions, in turn, are sections of the General Conference, with administrative responsibility for specific geographical areas, including, as relevant here, the North American Division (the "NAD").  The Church publishes a yearbook that

8

identifies the institutions established, owned, or controlled by officially recognized Seventh-day Adventist organizations and ministries.

**B.    The Gencon Insurance Program.**

26.    ARM is the official insurance and risk management company for the Church and Seventh-day Adventist ministries globally.  Gencon is the administrative entity set up and operated by the General Conference of Seventh-day Adventists that created the captive insurance company, Gencon, to issue insurance intended to cover the Church's own specific risks.

**1.    The Gencon Primary Insurance Coverage for the SDA Insureds.**

27.    Gencon issued annual primary commercial general liability policies between 1987 and the present.  For purposes of this action, the relevant general liability policies are those issued by Gencon for the policy periods between November 1, 1999 and November 1, 2011. These primary general liability policies provide broad occurrence-based coverage for claims alleging bodily injuries.

28.    The Named Insured under these general liability policies is the General Conference, but only as respects liability arising out of the NAD and its affiliated organizations (the "Gencon Primary GL Policies").  The Gencon Primary GL Policies are attached as Exhibits 1 through 11.

29.    The Gencon Primary GL Policies obligate Gencon to pay those sums the SDA Insureds "become[] legally obligated to pay as damages because of 'bodily injury' … to which this insurance applies" caused by an "occurrence" during a policy period.  *See, e.g.*, Ex. 2, 2001 Gencon Primary GL Policy at Liability Coverage Form, § I ("Coverages"), ¶ 1.

30.    The Gencon Primary GL Policies define "Bodily injury" to mean "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." *Id.* § V ("Definitions"), ¶ 3.

9

31.    The Gencon Primary GL Policies define "Occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*. § V ("Definitions"), ¶ 12.

32.    The Gencon Primary GL Policies provide that Gencon has the right and duty to defend its insureds for claims seeking damages for bodily injury to which the insurance applies. *See, e.g.,* Ex. 2, 2001 Gencon Primary GL Policy at Liability Coverage Form, § I ("Coverages").

33.    The "Each Occurrence Limit" for each of the Gencon Primary GL Policies is $1 million.  There are no aggregate limits applicable to bodily injury claims under the Gencon Primary GL Policies.

34.    The Gencon Primary GL Policy for the November 1, 1999 – November 1, 2001 policy period contains the following "Sexual Harassment-Sexual Misconduct Exclusion Endorsement":

> The following exclusion is added to paragraph 2., Exclusions of Coverage A – Bodily Injury and Property Damage Liability (Section I – Coverages):
>
> This insurance does not apply to any claim or damages for:
>
> "Bodily Injury" … sustained by:
>
> 1) any person (including their estate), which arises from actual or alleged, "sexual harassment," "sexual misconduct," "sexual molestation," or "sexual discrimination," however termed or labelled, including but not limited to negligent hiring, negligent supervision, infliction of emotional distress, negligence, fraud, breach of contract or defamation. …
>
> These exclusions apply:
>
> > (1)    Whether the insured is alleged or may be liable as an employer or in any other capacity; and
> >
> > (2)    To any actual or alleged obligation to share damages with or repay any other person or organization who must pay damages because of the injury.

10

Ex. 1, 1999-2001 Gencon Primary GL Policy at Sexual Harassment-Sexual Misconduct

Exclusion Endorsement.

35.    The definitions applicable to the "Sexual Harassment-Sexual Misconduct

Exclusion" in the Gencon Primary GL Policies are contained in an Endorsement that provides:

> "Sexual harassment" means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose of effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

> "Sexual Misconduct" means improper or unlawful sexual behavior other than sexual harassment."

> "Wrongful Termination" means wrongful termination of the employment of an employee of the Named Insured.

*See* Endorsement "Section V – Definitions"; "General Liability Amendatory Endorsement".

This policy language applies to exclude that portion of a claim alleging sexual misconduct, even

outside the employment context.

36.    Accordingly, by its terms, the 1999-2001 Gencon Primary GL Policy exclusion

does not bar claims for non-sexual physical abuse at all, but does exclude "actual or alleged"

sexual abuse, and also secondary or derivative liability claims including "negligent hiring,

negligent supervision, infliction of emotional distress, negligence, fraud, breach of contract or

defamation".

37.    Beginning with the November 1, 2001 – November 1, 2002 policy period and

continuing through the November 1, 2010 – November 1, 2011 policy period, the "Sexual

Harassment-Sexual Misconduct Exclusion" was replaced by an "Abuse or Molestation Exclusion", which was further deleted and amended by a "General Liability Amendatory" Endorsement to read in full:

> The following exclusion is added to Paragraph 2., Exclusions of Coverage A – Bodily Injury and Property Damage Liability (Section I – Coverages) . . .
> This insurance does not apply to "bodily injury" … arising out of:
>
> 1.      The actual or threatened sexual abuse or sexual molestation

*See, e.g.*, Ex. 3, 2002 Gencon Primary GL Policy at General Liability Amendatory Endorsement.

38.      This narrower sexual misconduct exclusion only precludes coverage for bodily injuries arising from actual sexual misconduct committed by an SDA Insured.  It specifically modifies the prior exclusion to carve-back coverage for negligence and secondary or derivative liability claims arising out of sexual misconduct. Claims for bodily injury from non-sexual physical abuse are also not excluded.

39.      Each of the Gencon Primary GL Policies contains an exclusion for "bodily injury … expected or intended from the standpoint of the Insured."  However, pursuant to a "Corporal Punishment" Endorsement, the exclusion does not apply to bodily injury resulting from "[c]orporal punishment to your student administered by or at the direction of any insured."  *See, e.g.*, Ex. 3, 2002 Gencon Primary GL Policy at Corporal Punishment Endorsement.

40.      Gencon also issued primary claims-made Employment Practices and Sexual Misconduct policies that cover employment practices liability claims against the SDA Insureds and apply to allegations of sexual misconduct generally in the workplace and not covered by other Gencon policies (the "EPL Primary Policies").  The EPL Primary Policies provide coverage on a claims-made basis for employment-related claims, including allegations of wrongful termination, sexual misconduct, or sexual harassment in the workplace, such as claims

12

against employees and volunteers of an SDA insured.  Under the terms of the EPL Primary

Policies, claims covered under the Gencon Primary GL Policies are excluded under the EPL

Primary Policies.  *See, e.g.,* Ex. 12, 2016-17 EPL Policy § 4 ("Exclusions"), Exclusion F

(excluding "[c]laim(s), loss amounts and/or defense costs or any other loss for which any insured

has coverage under any other type of insurance policy issued by us."); *id.* § 10 ("Conditions"), ¶

C ("Other Insurance") (same).

41.    The EPL Primary Policies include the following definitions:

> **Sexual harassment** means unwelcome sexual advances, requests
> for sexual favors or other verbal or physical conduct of a sexual
> nature that (1) explicitly or implicitly are made a condition of
> employment, (2) are used as a basis for employment decisions, or
> (3) create a work environment that interferes with performance.
>
> **Sexual misconduct** means allegedly unlawful or abusive physical,
> conduct of a sexual nature.
>
> **Sexual Molestation** means unwanted or inappropriate sexual
> activities, including subjecting another individual to indecent or
> nonconsensual advances for the perpetrator's own sexual
> gratification, whether or not such advances involve actual physical
> contact with the victim. **Sexual molestation** also includes verbal
> advances or displays of sexually explicit images or suggestive
> pictures to the victim, if such actions constitute the violation of any
> state, federal, or local ordinance, law, or statute. Provided however,
> that this definition shall not apply to any claim or suit alleging
> **Sexual Harassment** as defined in 7. Definitions, J. of this policy.

*Id.* § 7 ("Definitions"), ¶ N, ¶ O, ¶ P

### 2.    The Gencon Excess Insurance Coverage for the SDA Insureds

42.    Gencon also issued two layers of excess general liability insurance policies to the

SDA Insureds for each of the annual policy periods between 1995 and the present.  For purposes

of this action, the relevant excess general liability policies are those issued by Gencon between

the policy periods July 1, 1999 – July 1, 2000 and July 1, 2010 – July 1, 2011 (the "Gencon

Excess Policies").  The Gencon Excess Policies are attached as Exhibits 13 through 35.

43.    Gencon also issued separate corresponding layers of excess claims-made employment practices and sexual misconduct insurance policies to the SDA Insureds for each of the annual policy periods between 1995 and the present ("Gencon EPL Excess Policies").  The terms and conditions of the EPL Excess Policies are substantively similar to those in the EPL Primary Policies.

44.    Even though Gencon issued separate EPL Excess Policies, the regular Gencon Excess Policies are excess of both the Gencon Primary GL Policies and the EPL Primary Policies, and could apply to claims handled under the EPL Primary Policies unless modified by endorsement.

45.    The annual limits of the Gencon Excess Policies are as follows:

| Policy Year(s) | First Excess Layer | Second Excess Layer |
|---|---|---|
| 7/1/1999-7/1/2000 | $1 million excess of $1 million | $23 million excess of $2 million |
| 7/1/2000-7/1/2001 | $1 million excess of $1 million | $23 million excess of $2 million |
| 7/1/01-7/1/02 | $2 million excess of $1 million | $2 million excess of $3 million AND $20 million excess of 2 million excess of $3 million |
| 7/1/02-7/1/03 to 7/1/07-7/1/08 | $1 million excess of $1 million AND $1 million excess of $1 million excess of $1 million | $2 million excess of $3 million AND $20 million excess of 2 million excess of $3 million |
| 7/1/08-7/1/09 to 7/1/10-7/1/11 | $1 million excess of $1 million AND $1 million excess of $1 million excess of $1 million | $22 million excess of $3 million |

46.    The Gencon Excess Policies are "follow form" policies, meaning that they follow the terms and conditions, including the exclusions and definitions, of the Gencon Primary GL Policies (and/or the EPL Primary Policies as the case may be), absent a specific exclusion in the Gencon Excess Policies:

14

> In consideration of the premium charged, it is hereby understood and agreed that:
>
> 1. As of the effective date of this policy, the terms and conditions of the underlying policy(s) shall apply unless specifically excluded by endorsement of this policy. Following form as respects all locations other than United States, Canada and the South Pacific Division shall mean following form of Gencon Insurance Company of Vermont policy Number . . . [for General Liability] unless otherwise provided for by a specific endorsement. . . .

*See* Exs. 17 and 18, 2001 Gencon Excess Policy Following Form Endorsement, Endorsement #3.

47.    From the July 1, 1999 – July 1, 2000 through the July 1, 2005 – July 1, 2006 policy periods, the Gencon Excess Policies contained one such endorsement, a "Sexual Misconduct, Sexual Harassment and Wrongful Termination Exclusion" Endorsement, which reads:

> It is understood and agreed that this policy does not apply to any liability resulting from actual or alleged sexual misconduct, sexual harassment, physical abuse, or sexual molestation and wrongful termination.

*See* Ex. 20, 2002 Excess Policy, Endorsement #13, "Sexual Misconduct, Sexual Harassment and Wrongful Termination Exclusion Endorsement".[2]

48.    None of the terms employed in this exclusion are defined in the Gencon Excess Policies. The term "sexual harassment" in the Gencon Primary GL Policies is defined to include "physical conduct of a sexual nature". The term "sexual misconduct" is defined in the Gencon Primary GL Policies to mean "improper or unlawful sexual behavior". The definition of "sexual misconduct" in the Gencon Primary GL Policies does not include "physical abuse". In contrast,

---

[2]    The 2004-2005 and 2005-2006 Second Excess Layer Policies title the endorsement as the "Sexual Misconduct, Sexual Molestation, Sexual Harassment, and Wrongful Termination Exclusion," and state that "[i]t is understood and agreed that this policy does not apply to any liability resulting from actual or alleged sexual misconduct, sexual molestation, sexual harassment, physical abuse, and wrongful termination."

DOCS-100882949.2

in the EPL Primary Policies, the terms "sexual misconduct" and "sexual harassment" both include "physical conduct of a sexual nature".

49.     This Endorsement was intended to shift claims that were being handled under the EPL Primary Policies to the EPL Excess Policies upon exhaustion of the applicable EPL Primary Policy, and not to exclude liability for claims that are properly handled under the Primary GL Policies.

50.     Like the Gencon Primary GL Policies from November 2001 through November 2014, this Endorsement also only applies to "actual or alleged sexual misconduct . . .", and specifically avoids excluding secondary or derivative liability claims such as "negligent hiring, negligent supervision, infliction of emotional distress, negligence, fraud, breach of contract or defamation". *Compare* 1999-01 Primary GL Policy at Sexual Harassment-Sexual Misconduct Exclusion, *with* 2002 Gencon Primary GL Policy at General Liability Amendatory Endorsement, *and* 2002 Excess Policy, at Endorsement #13, "Sexual Misconduct, Sexual Harassment and Wrongful Termination Exclusion Endorsement".

51.     From the July 1, 2006 – July 1, 2007 through the July 1, 2009 – July 1, 2010 policy periods, the Gencon Excess Policies were further amended to include a "Sexual Misconduct, Sexual Molestation, Sexual Harassment, and Employment Practices Exclusion" Endorsement that reads:

> This policy does not apply to any liability resulting from:
>
> 1.     Actual or alleged sexual misconduct, sexual molestation, sexual harassment or physical abuse; and
>
> 2.     Wrongful Termination, Harassment or Discrimination claims, and claims arising out of the following:
>
> a.     a past, present or prospective employee of the Insured, arising from any employment action, practice, policy or acts or omissions of the

16

Insured including but not limited to that of hiring or firing, promotion or demotion, performance evaluation, compensation, disciplinary action, retirement, layoff or transfer, or

b.       any relative or member of the family of that past, present, or prospective employee as a consequence of (a) above.

This exclusion applies:

(1)      Whether the insured may be liable as an employer or in any other capacity; and

(2)      To any obligation to share damages with or repay someone else who must pay damages because of the injury.

All other terms and conditions of the policy remain the same.

*See, e.g.*, Ex. 30, 2008 Excess Policy, Endorsement #15, **"Sexual Misconduct, Sexual Molestation, Sexual Harassment, and Employment Practices Exclusion Endorsement"**.

52.      In the July 1, 2010 – July 1, 2011 policy period, the Gencon Excess Policies were further amended to contain an Excess Policy "Inappropriate Employment Practices, Sexual Misconduct, Sexual Harassment, and Discrimination Exclusion Endorsement" that reads:

This policy does not apply to any liability resulting from:

1.       Actual or alleged sexual misconduct, sexual harassment; and

2.       Inappropriate Employment Practices or Discrimination claims, and claims arising out of the following:

a.       a past, present or prospective employee of the Insured, arising from any employment action, practice, policy or acts or omissions of the Insured including but not limited to that of hiring or firing, promotion or demotion, performance evaluation, compensation, disciplinary action, retirement, layoff or transfer, or

b.       any relative or member of the family of that past, present, or prospective employee as a consequence of (a) above.

This exclusion applies:

(1)    Whether the insured may be liable as an employer or in any other capacity; and

(2)    To any obligation to share damages with or repay someone else who must pay damages because of the injury.

All other terms and conditions of the policy remain the same.

53.    Compared to the prior year exclusion, this exclusion removed "Sexual Molestation" from both the title and stanza 1 of the exclusion.  It also removed "physical abuse" from stanza 1, and "physical abuse" was never in the title of the exclusion.

**C.    Gencon's Facultative Reinsurance Program.**

54.    Between 1995 and the present, Gencon purchased reinsurance coverage whereby it ceded the risks under the second layer Gencon Excess Policies to various reinsurers pursuant to treaty or facultative reinsurance agreements.   Pursuant to these reinsurance contracts, the reinsurance companies agreed to indemnify Gencon for the defense costs and settlement amounts Gencon pays for claims under the Gencon Excess Policies.

**1.    The Westport Facultative Reinsurance**

55.    Gencon also ceded the risks under the second layer Gencon Excess Policies from July 1, 1999 through October 15, 2005 to the Swiss Re entity Westport pursuant to "Facultative Reinsurance Certificates" that Westport issued to Gencon for each of the annual policy periods from the July 1, 1999 – July 1, 2000 policy period through the July 1, 2004 – October 15, 2005 policy period (the "Westport Facultative Certificates").

56.    The "General Insurance Co of Vermont" is the "Name of Insured" under the Westport Facultative Certificates.

57.    Pursuant to the Westport Facultative Certificates, Westport reinsures one hundred percent (100%) of the second layer Gencon Excess Policies for "Lines of Business" specified in a Reinsurance Schedule or an Endorsement.  *See, e.g.*, Westport Facultative Certificate, FCC-

18

0642781-08-2001, Declarations, Items 7.A., 7.B., as amended by Endorsement thereto, attached as Exhibit 36.

58.     The "lines of business" reinsured includes "following form excess commercial general liability . . . (occurrence form.)" and separately "following form excess sexual misconduct and harassment and wrongful termination, claims made[.]"  *See id.*, Westport Facultative Certificate Endorsement.

59.     The Westport Facultative Certificates further confirm that they apply separately to both the Gencon Excess Policies and the Gencon EPL Excess Policies, subject to an aggregate limit. For example, the July 1, 2001 – July 1, 2002 Westport Facultative Certificate states that it applies to Gencon excess policy "XL501017" (a GL excess policy) and to Gencon excess policy "XL501018" (an EPL excess policy) subject to a $22M aggregate limit.  *See* Ex. 36 at July 1, 2001 – July 1, 2002 Reinsurance Schedule; *see also id.* at Endorsement #1.

60.     The Westport Facultative Certificates apply to "Item 7A of the Reinsurance Schedule under the Reinsured's policy identified in Item 4 of the Reinsurance Schedule (the "Reinsured Policy") as respects occurrences taking place during the certificate period, if the Reinsured Policy applies on an occurrence basis …."

61.     The term "Occurrence" in the Westport Reinsurance Certificates has the same meaning ascribed thereto in the reinsured Gencon Excess Policies (which incorporate the definition of "occurrence" from the Gencon Primary GL Policies).  *See id.,* § I. ("Application of Certificate").

62.     Pursuant to the Westport Facultative Certificates, "[Westport] shall reimburse [Gencon]  . . . promptly for loss against which indemnity is herein provided, upon receipt . . . of satisfactory evidence of payment of such loss."  *See id.*, § V. ("Claims").

63.    The Westport Facultative Certificates defines "Loss" to mean "only such amounts as are actually paid by [Gencon] in settlement of claims … including amounts paid as claims expenses." *Id*. § III. ("Definition of Loss and Claim Expenses")

64.    Pursuant to the Westport Facultative Certificates, Gencon agreed that it would "investigate and will settle or defend all claims arising under the Reinsured Policy", subject to Westport's right to participate jointly with Gencon in the investigation, adjustment or defense of claims. *See id.*, § V. ("Claims").

65.    No endorsement or any other provision in the Westport Facultative Certificates relieves Westport of its obligation to reimburse Gencon for payments by Gencon for the reasonable settlement of claims under the Gencon Excess Policies.

### 2.    The Lexington Facultative Certificates

66.    Relevant to this action, Gencon ceded the risks under the second layer Gencon Excess Policies between October 15, 2005 and July 1, 2011 to Lexington pursuant to "Certificates of Facultative Reinsurance" Lexington issued to Gencon for each of the annual policy periods from the October 15, 2005 – July 1, 2006 policy period through the July 1, 2010 – July 1, 2011 policy period (the "Lexington Facultative Certificates").

67.    The "General Conference Corporation of Seventh-day Adventists" is the Named Insured under the Lexington Facultative Certificates. *See* Ex. 40, 2005-2006 Lexington Facultative Certificate, Endorsement # 001.

68.    The Lexington Facultative Certificates provide "Commercial Umbrella Liability" reinsurance. *See* 2005-2006 Lexington Facultative Certificate, Declarations, Section 1, "Type of Insurance".

69.     The Lexington Facultative Certificates for the October 15, 2005 – July 1, 2006, July 1, 2006 – July 1, 2007, and July 1, 2007 – July 1, 2008 policy periods provide reinsurance coverage of $20 million each occurrence excess of $2 million.  *See, e.g.*, 2005-2006 Lexington Facultative Certificate, Declarations, Section II, "Policy Limits and Application", attached as Exhibit 40.

70.     The Lexington Facultative Certificates for the July 1, 2008 – July 1, 2009 through the July 1, 2010 – July 1, 2011 policy periods provide reinsurance coverage of $22 million each occurrence excess of $3 million.  *See, e.g.*, 2009-2010 Lexington Facultative Certificate, Declarations, Section II, "Policy Limits and Application", as amended by Endorsement #15, attached as Exhibit 44.

71.     Each of the Lexington Facultative Certificates contains a clause, consistent with industry custom and practice, that obligates Lexington to pay Gencon for reasonable settlements of claims Gencon paid under the Gencon Excess Policies, absent fraud, collusion with an insured, or bad faith:

> The liability of the Reinsurer shall follow the terms and conditions of the Company's policy furnished to the Reinsurer at the effective date of this Reinsurance Certificate, unless otherwise specifically provided herein by endorsement made a part of this Certificate."

*See, e.g.*, 2005-2006 Lexington Facultative Certificate, General Conditions, § 1 ("Liability of Reinsurer and Retention"), attached as Exhibit 40.

72.     Pursuant to this provision, the definition of "occurrence" from the Gencon Primary GL Policies, which is incorporated in the "follow form" Gencon Excess Policies, applies to the Lexington Facultative Certificates.

21

73.     No endorsement or any other provision in the Lexington Facultative Certificates relieves Lexington of its obligation to reimburse Gencon's payment for settlements of claims under the Gencon Excess Policies.

74.     Pursuant to the Lexington Facultative Certificates, Gencon agreed that it would "promptly investigate and will settle or defend all claims under the policy reinsured", subject to Lexington's right to associate in the defense or control of any claim.  *See, e.g.*, 2005-2006 Lexington Facultative Certificate, General Conditions, § 2.a.; 2.b, attached as Exhibit 40.

75.     Accordingly, Gencon's decision to defend and settle underlying claims in good faith obligates Lexington to reimburse Gencon upon proof of payment of a loss:

> Upon receipt by Reinsurer of satisfactory evidence of payment of a loss for which reinsurance is provided hereunder, Reinsurer shall promptly reimburse the Company for its share of the loss and loss expense, subject to paragraph 4 of these General Conditions.

*Id.* at General Conditions, § 2.c.

76.     Under the Lexington Facultative Certificates, "loss" means, "only such amounts as are actually paid by [Gencon] in settlement of claims…."

**D.     The Miracle Meadows Claims.**

77.     Miracle Meadows was a West Virginia boarding school founded in 1988 by Gayle Clark.  She intended the facility to serve as an alternative school for difficult, behaviorally-challenged children from SDA congregant homes, but who struggled in traditional Church schools.  Although Ms. Clark was a member of the Church, the Church did not own Miracle Meadows, and the school was not sanctioned by or an official ministry of the SDA Church or a part of the SDA education system.  None of the Miracle Meadows instructors or staff members were SDA employees.

22

78.    In 2014, following several investigations by the West Virginia Department of Health and Human Resources, and after a student attempted suicide, state police raided the school.  They discovered horrific abuse and neglect had occurred and shut down the school and arrested Ms. Clark and several staff members.

79.    Starting in 2017, twenty-seven (27) former Miracle Meadows students filed individual lawsuits against various defendants, including, among others, Miracle Meadows, the Mountain View Conference ("MVC"), the Columbia Union Conference ("CUC"), the North American Division of Seventh-day Adventist ("NAD"), Adventist Laymen's Services & Industries ("ASI"), and ASI Missions, Inc. ("ASIM") (the "Round One Claims", and together with all subsequent claims filed against the SDA Insureds, the "Miracle Meadows Claims").  The Round One Claims alleged that between 1999 and 2014, Miracle Meadows subjected the students to wide-ranging abhorrent living conditions and various forms of physical and emotional abuse, false imprisonment, educational, medical, and nutritional neglect, causing bodily injury, emotional distress, and mental anguish.

80.    The specific forms of alleged non-sexual physical abuse included quarantine, where students were locked in windowless rooms, sometimes for weeks at a time, with limited nutrition and education, and forced to strip to their undergarments, use coffee cans as a latrine and bare floors as bedding.  Staff employed physical restraints regularly, handcuffing students to trees and poles or tethering students together.  Students also were forced to perform manual labor in lieu of education, working in extreme weather without adequate clothing, and being regularly denigrated and humiliated.  Many students alleged that they were the victims of sexual misconduct by staff members and/or other students.  Almost all the allegations lacked specificity regarding the number and timing of the incidents.

23

81.     The staff members accused of harming the students were not employees of any SDA Insured, and the Round One Claims did not allege physical abuse or sexual misconduct by any of the SDA Insureds directly.

82.     Instead, the Round One Claims alleged vicarious or derivative liability against the SDA Insureds for the physical abuse or sexual misconduct, as well as independent, non-derivative negligent acts against the SDA Insureds, including lack of due diligence, the failure to protect students from barbaric living conditions throughout each academic year the school was open, and actual or constructive knowledge of the wrongdoing at the school.  They also allege civil conspiracy against the SDA Insureds, based on the purported knowledge of certain board members and Miracle Meadows.

83.     ARM retained multiple defense counsel for the various SDA Insureds.  Counsel for NAD, MVC, and CUC was an experienced and sophisticated litigator, specifically including extensive abuse litigation experience for religious institutions for over ten (10) years.  He was designated the lead attorney to defend the SDA Insureds against the Round One Claims.

84.     Miracle Meadows separately defended against these claims. Its insurer, National Union Fire Insurance Company of Pittsburgh, PA, ("National Union") a subsidiary of AIG, whose policies were administered through the West Virginia Board of Risk Insurance Management ("BRIM") appointed and paid for Miracle Meadows' defense counsel.

85.     Discovery regarding the Round One Claims began in earnest in early 2019, which confirmed generally the allegations that the students were subjected to inhumane conditions, including physical, emotional, education, and nutritional abuse and deprivation.  Some of the Round One Claims testified about instances of sexual abuse, albeit without any specific dates, but many others could not verify their pleaded allegations of sexual misconduct.

24

86.     Following this discovery concerning the conditions and alleged abuse, an opportunity arose to settle the Round One Claims.  However, plaintiffs' counsel demanded a global resolution of all claims for $20 million.

87.     Both defense counsel for the SDA Insureds and the experienced claims handlers at ARM expressed concerns for the substantial liability posed by the claims against the SDA Insureds.  Defense counsel advised that the trial judge would consider any statute of limitations defense a question of fact for the jury and would not dismiss the complaints, and that there was virtually no chance of prevailing on summary judgment on any of the other issues; trial was inevitable.  The trial judge signaled that if the cases went to trial, she would view it as a failure on the part of the SDA Insureds to negotiate in good faith and that her trial rulings would reflect that opinion.  Defense counsel advised that the SDA Insureds could be exposed to verdicts exceeding $5 million per claimant, and defense costs could increase dramatically.

88.     Given the potential exposure to a runaway jury verdict if any one of the claims proceeded to trial and other risks, ARM settled the Round One Claims for a total amount of $19 million, which was apportioned for amounts between $500,000 and $1 million per claimant. Part of this settlement was also funded by Philadelphia Indemnity Insurance Company ("PIIC"), which sold policies to MVC, an SDA Insured, between 2008-2011. PIIC ultimately tendered its full limits under all MVC policies to settle various Miracle Meadows Claims.

89.     Miracle Meadows settled separately with the plaintiffs for an undisclosed amount, though recent news articles indicate that Miracle Meadows' insurer, National Union/BRIM have incurred over $100 million settling various Miracle Meadows Claims.

90.     Starting in 2021, sixteen (16) new claimants (the "Round Two Claims") asserted essentially identical, primarily non-sexual physical abuse claims as the Round One Claims.  Lead

counsel in the defense for the Round One Claims served as defense counsel for all SDA Insureds

for the Round Two Claims. Defense counsel and ARM evaluated the Round Two Claims and

concluded that similar evidence concerning the inhumane living conditions would be adduced,

and that the same exposure and risks that led ARM to settle the Round One Claims existed.

Accordingly, defense counsel arranged mediation with plaintiffs' counsel, which resulted in a

settlement of the Round Two Claims in November 2021 for amounts between $450,000 and

$650,000 per Claimant.

91.    Subsequently, additional rounds of claims, for a total of eight rounds, were filed

by former students premised on similar allegations. The defense of these additional rounds of

claims was conducted by the same defense counsel as for the Round One Claims and the Round

Two Claims. ARM arranged mediation and also settled these cases (a separate mediator was not

retained under the fourth round) for amounts between $450,000 and $650,000.

92.    To date, ARM has settled the claims of one hundred seventy-seven (177) former

students and paid $86,694,000 in settlement amounts and incurred $2,007,121.39 in defense

expenses.

**E.    ARM's Coverage Determinations with Respect to the Miracle Meadows Claims Under the Gencon Policies.**

93.    When ARM received the initial two Round One Claims in February 2017, it

evaluated the complaints to determine whether a duty to defend was triggered. It concluded that

the claimants alleged bodily injury in large part from non-sexual physical abuse, that the theories

of liability sounded in negligence, that there were no allegations that any of the SDA Insureds

committed sexual abuse, and that no exclusion applied to preclude coverage entirely. Therefore,

in March 2017, ARM determined that the duty to defend under a general liability primary policy

DOCS-100882949.2

issued to MVC was triggered and elected to provide coverage to all of the SDA Insureds named in the suit under that policy.

94.     In September and October 2017, when additional lawsuits were filed against other SDA Insureds, ASI and ASIM, and the original underlying plaintiffs added those SDA Insureds as defendants, ARM elected to cover the claims under the Gencon Primary EPL Policies issued to NAD, rather than those issued specifically to MVC.  ARM did so because the policy language was substantively similar and ASI and ASIM were more closely connected with NAD than MVC, and in conformance with prior ARM practices of handling complex claims against lower level insureds under the broadest "umbrella" of parent organization policies.

95.     ARM opened up the portion of the claims alleging sexual abuse under the NAD 2016-2017 EPL Policy.  Consequently, ARM handled the non-sexual physical abuse allegations under the Gencon Primary GL Policies and the sexual abuse allegations under the EPL Primary Policies.

96.     In or around May 2020, ARM stopped handling any part of the Miracle Meadows Claims under the EPL Primary Policies and switched the claims, in full, to the Gencon Primary GL Policies sold to NAD.  ARM did so based on several factors.  First, most of the evidence adduced by that time demonstrated that the allegations of non-sexual physical abuse predominated.  Additionally, parsing the claims between the two lines of insurance would be impossible, particularly when many of the sexual abuse allegations could not be established conclusively.  Regardless, the sexual abuse claims were covered under the Gencon Primary GL Policies, and the EPL Primary Policies dictate that where any insured has loss that is covered under any other policy issued by Gencon, coverage is excluded under the EPL Primary Policies. *See, e.g.,* Ex. 12, 2016-17 EPL Policy, § 4 ("Exclusions"), Exclusion F. (stating that the policy

27

does not apply to any "[c]laim(s), loss amounts and/or defense costs or any other loss for which any insured has coverage under any other type of insurance policy issued by us."); *Id.* §10 ("Conditions"), C. ("Other Insurance") ("This policy does not apply to a loss covered under another policy issued by us.").  Further, the claimants did not allege that sexual abuse was committed by any SDA Insured employee, so the claims were not traditional employment practices claims.

97.    ARM also determined that no exclusion in the Gencon Primary GL Policies or the Gencon Excess Policies (together, the "Gencon Policies") applied to preclude Gencon's indemnification obligations for the settlement of the Round One Claims and, consequently, any of the other Miracle Meadows Claims.  Accordingly, Gencon paid the settlements on behalf of the SDA Insureds.

98.    ARM further concluded that the settlement amounts were reasonable, given the advice of defense counsel, the experiences of Gencon's claims handlers, the need to avoid catastrophic exposure (including a potential bad faith claim for failure to settle within policy limits), that the claims primarily involved non-sexual physical abuse and that the potential damages exposure for the non-sexual physical abuse alone far exceeded the settlement amounts that ARM paid to settle the Miracle Meadows Claims.

### F.    Gencon's Handling of the Reinsurance Claims.

99.    ARM began providing reports of the Miracle Meadows Claims to Gencon's reinsurers in March 2017, just a month after the first Miracle Meadows lawsuit was filed.  ARM continued to provide updates on the Miracle Meadows Claims to its reinsurers, including updates on case status, settlement recommendations, coverage analysis, ARM's decision to originally book the claims as GL claims, then partially as EPL claims, and then to fully book the claims as

GL claims, and ARM's methodology for allocating the claims, and provided billing requests to its reinsurers for reimbursement of defense costs and settlement amounts paid.

100.    For purposes of indemnifying the SDA Insureds, ARM did not need to identify the number of "occurrences" presented by the Miracle Meadows Claims because it had determined that the Gencon Policies covered the claims and there was no applicable aggregate limit under those policies.

101.    However, for reinsurance purposes, ARM originally allocated the Round One Claims to the three policy years that involved the most egregious injuries.  Gencon then billed the reinsurance companies that reinsured the excess policies in those three years – which did not include Westport, but which did implicate two years of Lexington's facultative reinsurance. Certain of Gencon's reinsurers paid ARM's billings based on this payment methodology.

102.    ARM subsequently determined that its initial methodology was not appropriate considering the complexity and breadth of the claims that were starting to emerge and that it was inconsistent with the contract language.  Therefore, ARM revised its methodology to allocate claims within the next settlement rounds based on the first year of attendance of the new claimants, even if they attended Miracle Meadows for multiple years.  This was appropriate because many claimants expressed uncertainty about when certain events took place and the incompleteness of Miracle Meadows' records.  This also preserved the general thrust of the allegations that students sustained primarily non-sexual physical abuse injuries from exposure to abhorrent living conditions upon arrival at the school and that students were subject to these conditions each academic year.

103.    As more rounds of Miracle Meadows Claims were filed and ARM entered into subsequent settlement rounds, ARM allocated the amounts it paid for each claimant based on a

claimant's initial attendance date within each settlement round. ARM issued new billings to the reinsurers, many of whom paid under that methodology.

104.    However, certain reinsurers, including Lexington, questioned the billing methodology. ARM ultimately agreed to revise its billing methodology to no longer have separate allocation methodologies for the Round One Claims and the subsequent rounds or to artificially separate loss allocation based on settlement rounds. Thus, ARM's revised billing method is still premised on the students' first date of attendance, which is allocated to a reinsurance year. Accordingly, ARM opened nineteen (19) reinsurance claims—one for each year that Miracle Meadows was open and received students—and then placed all claimants into a claim and reinsurance year using each reinsurance contract effective date for a uniform date of loss. In any claim year where the aggregated allocated loss was greater than $1,000,000, the Gencon Excess Policies were considered triggered.

105.    Under ARM's revised methodology, it has billed $36,439,052.90 to Lexington and $19,002,272.74 to Westport that Gencon has paid which these Reinsurers have not reimbursed.

106.    ARM's decision to book the Miracle Meadows Claims as nineteen (19) "occurrences" is reasonable based on the nature of the Miracle Meadows Claims. The claims are not rooted in isolated instances of abuse involving a few students; rather, the allegations are of bodily injuries resulting primarily from non-sexual physical abuse because of wide-ranging neglect and were based on the SDA Insureds' alleged failure to protect students from these "barbaric living conditions" each academic year. Additionally, many of the claimants could not provide precise dates or number of instances of alleged abuse, and Miracle Meadows did not keep reliable records of the students' attendance dates or reports of abuse. The overwhelming

30

majority of plaintiffs presented fact sheets, allegations, or evidence that they were harmed starting essentially the moment or within days of arriving at Miracle Meadows.

107.    ARM's booking of the Miracle Meadows Claims as nineteen (19) "occurrences" also is proper under the applicable contract terms.  The Lexington Facultative Certificates and the Westport Facultative Certificates follow the terms of the Gencon Excess Policies, which, in turn, follow the terms and condition of the Gencon Primary GL Policies.  The Gencon Primary GL Policies provide coverage for any bodily injury caused by an "occurrence" during the policy period.  The Gencon Primary GL Policies define "occurrence" to mean "an accident including continuous or repeated exposure to substantially the same general harmful conditions."  Beginning the first day students arrived at Miracle Meadows, they were continuously or repeatedly exposed to the inhumane conditions that were caused by the SDA Insureds' alleged negligent oversight and failure to protect the claimants from the alleged abuse during the academic year.  Thus, ARM's booking of the claims as one "occurrence" per academic year is the most consistent with the allegations surrounding the Miracle Meadows Claims.

108.    Lexington and Westport contend that they are not obligated to pay some or all of the Miracle Meadows defense costs and settlements because the underlying claims against the SDA Insureds are not covered or because they disagree with Gencon's loss allocation.  However, the Reinsurance Contracts obligate the Reinsurers to "follow the-settlements" entered into by Gencon, and Gencon reasonably allocated the amounts it paid, and industry custom and practice permits Gencon to allocate as it sees fit.  Therefore, the Reinsurers must pay their share.

G.    **Lexington and Westport's Refusal to Pay Gencon for the Full Defense Costs and Settlement Amounts Paid by Gencon for the Miracle Meadows Claims.**

109.    Ten of Gencon's reinsurers have reimbursed Gencon in full for defense costs and settlement amounts under the revised billing methodology.

31

110.    Lexington and Westport, however, in dereliction of their contractual and legal obligation to Gencon, contend that they are not required to pay some or all of the defense costs and settlement amounts paid by Gencon for the Miracle Meadows Claims.

111.    The Miracle Meadows Claims primarily are claims alleging bodily injury from widespread, non-sexual physical abuse.  Yet, Lexington and Westport argue incorrectly that the Miracle Meadows Claims are not covered, claiming that: (i) the portions of the claims alleging sexual abuse are covered under the EPL Primary Policies, not the general liability policies; (ii) the sexual misconduct and physical abuse claims are excluded under the Gencon Excess Policies; and (iii) "civil conspiracy" allegations are not considered an "occurrence" under the Gencon Policies.  Additionally, and contrary to the law and custom and practice, Lexington and Westport dispute Gencon's reasonable allocation of its losses to the applicable Gencon Policies and reinsurance contracts.

112.    Lexington's and Westport's errors largely flow from their initial belief that ARM should have handled the Miracle Meadows Claims under the EPL Primary Policies. They are wrong. First, Lexington and Westport cannot second guess ARM's reasonable coverage determination to handle these as GL, and not EPL, claims. Second, even if they could Monday-morning quarterback ARM's reasonable coverage decision, they are simply wrong that the EPL Primary Policies could apply.

113.    According to these Reinsurers, the sexual abuse claims are demands alleging damages resulting from sexual misconduct or sexual molestation as those terms are defined in the EPL Primary Policies.  However, the Reinsurers ignore the terms of the EPL Primary Policies.  The EPL Primary Policies expressly exclude "[c]laim(s), loss amounts and/or defense costs or any other loss for which any insured has coverage under any other type of insurance

32

policy issued by us." *See, e.g.*, 2016-17 EPL Policy, attached as Exhibit 12, at § 4 ("Exclusions"), Exclusion F..  Moreover, the EPL Primary Policies' "Other Insurance" provision, when read in conjunction with Exclusion 4.F., further debunks the Reinsurers' argument.  The "Other Insurance" provision states: "This policy does not apply to a loss covered under another policy issued by us."  *Id.* §10 ("Conditions"), C. ("Other Insurance").  Here, as set forth above, and elaborated on immediately below, the alleged sexual misconduct is covered under both the Gencon Primary GL Policies and the Gencon Excess Policies.  Therefore, the sexual misconduct claims are not and cannot be covered by the EPL Primary Policies.

114.    Contrary to the Reinsurers' misguided belief, the sexual misconduct exclusions in the Gencon Primary GL Policies do not apply at all, let alone to preclude coverage entirely. Beginning with the July 1, 2001 – July 1, 2002 policy period, the Gencon Primary GL Policies replaced the "Sexual Harassment-Sexual Misconduct Exclusion" with an "Abuse or Molestation Exclusion", which itself was then modified by endorsement to exclude only bodily injury claims from actual or alleged sexual misconduct committed by an SDA Insured.  As Westport has acknowledged, the endorsement carved-back coverage for sexual abuse claims based on secondary or derivative liability or claims of negligent hiring, supervision, or retention – the precise claims alleged against the SDA Insureds.  Thus, the sexual misconduct exclusion does not apply, and the Miracle Meadows Claims are covered under the Gencon Primary GL Policies. And in any event, the Miracle Meadows Claims are predominantly for physical abuse arising out of the barbaric living conditions at the school, so the sexual misconduct exclusion plainly could not apply to completely remove coverage here under the Gencon Primary GL Policies.

115.    Because the Gencon Excess Policies follow the terms and conditions of the Gencon Primary GL Policies, the sexual misconduct exclusion does not preclude coverage under

33

the Gencon Excess Policies, either. Given that, Reinsurers pivot to contend that a separate "Sexual Misconduct, Sexual Harassment, and Wrongful Termination Exclusion" (later called a "Sexual Misconduct, Sexual Molestation, Sexual Harassment, and Employment Practices Exclusion" beginning on July 1, 2006[3] and later changed to an Excess Policy "Inappropriate Employment Practices, Sexual Misconduct, Sexual Harassment, and Discrimination Exclusion Endorsement" on July 1, 2010) precludes the entirety of the Miracle Meadows Claims, including the non-sexual physical abuse claims. Reinsurers misread the various permutations of this exclusion in several critical respects.

116.    First, the exclusion in effect between July 2001 and July 2006 by its express terms only excludes "actual or alleged" sexual misconduct, not secondary or derivative liability for negligence or negligent hiring, supervision, or retention. In that sense, this excess policy exclusion is just like the narrow exclusion in the Gencon Primary GL Policies in effect during these years, which specifically carved back coverage for those types of secondary or derivative liability and negligence claims.

117.    Second, and more fundamentally, these sexual misconduct exclusions in the Gencon Excess Policies were specifically designed to shift claims that were being handled under the EPL Primary Policies to the EPL Excess Policies, once the primary EPL layer was exhausted. They were not designed to apply to claims properly handled under the Gencon Primary GL Policies. The text of the various agreements demonstrates this:

---

[3]    The 2004-2005 and 2005-2006 Second Excess Layer Policies also title the endorsement as the "Sexual Misconduct, Sexual Molestation, Sexual Harassment, and Wrongful Termination Exclusion," but contain substantially the same language as the earlier exclusions, stating "[i]t is understood and agreed that this policy does not apply to any liability resulting from actual or alleged sexual misconduct, sexual molestation, sexual harassment, physical abuse, and wrongful termination."

34

a.  The exclusions in the Gencon Excess Policies track the language and structure of the EPL policy language, not the Gencon Primary GL Policies;

b.  The exclusions use employer liability language strongly suggesting that the exclusion can only apply to claims with an employment component;

c.  Underwriting material provided to reinsurers suggests a bifurcation in liability between GL occurrence-based claims and EPL claims-made claims;

d.  The contemporaneous reinsurance contracts with Westport and Lexington show that both entities knew they were separately reinsuring EPL claims-made claims and GL occurrence claims; and,

e.  The Gencon Primary GL Policies already have a sexual misconduct exclusion (in contrast with the EPL Primary Policies), so it would make little sense to have a different somewhat overlapping exclusion in the Gencon Excess Policies that would apply to GL losses.

118.    Third, the exclusions only apply to physical abuse that is sexual in nature, so even if the exclusions applied to sexual misconduct, they do not apply to the predominant claims at issue here—the barbaric living conditions at Miracle Meadows. This reading is supported by the text of the policies and other materials:

a.  The term "physical abuse" is surrounded by other terms in a list that all have a sexual component so it is accordingly modified and limited by those other terms;

b.  The Gencon Policies cover corporal punishment, so it would make no sense to specifically include an endorsement covering corporal punishment only to then exclude claims of non-sexual physical abuse;

     c.   The 2010-2011 excess policy does not even mention physical abuse as excluded, and in fact, unlike the other conduct listed in the exclusion, physical abuse was never included in the title of the endorsement, suggesting it was included to clarify the other excluded conduct, not as a separate category of excluded conduct, and was not identified as a separate excluded matter in the underwriting materials; and

     f.   The EPL Primary Policies define both sexual misconduct and sexual harassment as including physical conduct that is sexual in nature, which is incorporated into the Gencon Excess Policies (in contrast, it is unclear under the Gencon Primary GL Policies if sexual misconduct includes physical abuse that is sexual in nature).

119.    Additionally, Lexington and Westport misleadingly assert that any settlement amounts for the "civil conspiracy" causes of action are not covered under the Gencon Policies, and, in turn, the reinsurance certificates. They assert that a civil conspiracy is not an "accident", and, therefore, not an "occurrence" under the Gencon Policies. However, as Reinsurers know, while the SDA Insureds were concerned about the potential exposure to joint and several liability based on the civil conspiracy cause of action, the claims were settled before significant discovery took place on that cause of action. More importantly, ARM settled the Miracle Meadows Claims based on the alleged independent, non-derivative liability against the SDA Insureds sounding in negligence when the opportunity arose to do so at reasonable amounts for the non-sexual physical abuse injuries at the advice of underlying defense counsel – and did so to avoid bad-faith failure to settle claims within policy limits by the SDA Insureds. Simply put, no portion of the settlement amounts paid were for the civil conspiracy claims.

120.    Finally, relying on inapplicable case law and ignoring the facts of the Miracle Meadows Claims, Lexington and Westport challenge ARM's allocation based on ARM's reasonable determination that the Miracle Meadows Claims constitute 19 "occurrences" – one for each school year Miracle Meadows accepted students – into which ARM placed each claimant based on the claimant's first year of attendance at Miracle Meadows. Reinsurers claim that because there were allegedly multiple victims, perpetrators, and time frames of abuse over several years, a court might find separate occurrences for each victim, and, potentially, multiple occurrences per victim. But various courts have taken different positions on the number of occurrences in similar circumstances. Moreover, the Miracle Meadows Claims were not rooted in specific, isolated instances of abuse involving a few students; instead, the plaintiffs alleged wide-ranging neglect and abuse allegations based on the SDA Insureds' alleged failure to protect students from barbaric living conditions throughout each academic year. Reinsurers' proposed methodology would be unworkable, because the former students could not pinpoint specific dates or number of instances of abuse, and Miracle Meadows' records could not reliably establish each claimant's attendance dates.

121.    Reinsurers' position also is undermined by the policy language. "Occurrence" is defined to mean "an accident including continuous or repeated exposure to substantially the same general harmful conditions." The students were continuously or repeatedly exposed to the same inhumane conditions caused by the SDA Insureds' alleged negligence and failure to protect the students beginning when they arrived at Miracle Meadows. Therefore, ARM's decision to book the Miracle Meadows Claims as nineteen occurrences, comporting with the academic years Miracle Meadows accepted students, was reasonable under the circumstances and acceptable

under industry custom and practice that permits Gencon to allocate in a manner it views as favorable.

122.    Even if another allocation methodology also were reasonable, Lexington and Westport are obligated to reimburse Gencon for settlement payments Gencon made for claims under the Gencon Policies.

## COUNT I
## BREACH OF CONTRACT

123.    Gencon repeats and realleges paragraphs 1 through 122 as if fully set forth herein.

124.    Gencon has complied with all terms and conditions precedent under the Gencon Policies.

125.    Gencon also has paid all premiums and otherwise complied with all terms and conditions precedent under the Lexington Facultative Certificates and the Westport Facultative Certificates.

126.    Pursuant to the terms of their respective Facultative Reinsurance Certificates, Lexington and Westport are obligated to compensate Gencon for all of the defense costs incurred in defending against the Miracle Meadows Claims.

127.    Lexington and Westport are also obligated to indemnify Gencon under the terms of their respective Facultative Reinsurance Certificates for the amounts paid by Gencon to settle the Miracle Meadows Claims.

128.    Lexington and Westport have breached their respective obligations under their respective Facultative Reinsurance Certificates by failing and refusing to reimburse Gencon for the full amount of losses incurred and paid by Gencon for the Miracle Meadows Claims.

129.    ARM has billed $36,439,052.90 to Lexington and $19,002,272.74 to Westport that Gencon has paid in defense and settlement of the Miracle Meadows Claims under the

38

Gencon Policies that Lexington and Westport have not reimbursed as required under their respective Facultative Reinsurance Certificates.

130.    By reason of Lexington's and Westport's breaches, Gencon has been deprived of the benefits due and owed under the respective Facultative Reinsurance Certificates.

131.    Lexington and Westport also are liable for all other losses that Gencon has suffered or may suffer in the future as a result of the handling of the Miracle Meadows Claims reinsurance claim, including consequential damages, together with the costs and disbursements of this action, including, but not limited to, reasonable attorneys' fees and pre-judgment and post-judgment interest.

132.    Each of the Lexington Facultative Reinsurance Certificate and the Westport Facultative Reinsurance Certificate contains an implied promise that Lexington and Westport would deal fairly and in good faith with Gencon and would do nothing to injure, frustrate, or interfere with Gencon's rights to receive the benefits of the respective Facultative Reinsurance Certificates.

133.    The covenant of good faith and fair dealing obligates Lexington and Westport to refrain from taking any action which would deprive Gencon of the benefits of the contract or cause undue hardship or harm to Gencon through an unreasonable or intentional failure and refusal to pay the subject reinsurance claim.

134.    Lexington and Westport each has breached its duty of good faith and fair dealing by engaging in conduct calculated to further their own economic interests at the expense of its cedent, Gencon, by improperly refusing to pay a covered reinsurance claim, by asking for repeated and irrelevant information, and by unnecessarily delaying payment to Gencon.

39

Accordingly, Lexington and Westport are liable for consequential damages, including attorneys' fees to enforce its contractual rights to reinsurance coverage.

135.    Gencon is suffering consequential damages due to Lexington's and Westport's wrongful, unjustified and inappropriate delay, failure to reimburse Gencon for the settlements of the covered claims it paid, and imposition of unwarranted assertion of defenses to payment.

136.    It was within the contemplation of the parties that should Lexington or Westport refuse to timely reimburse Gencon for payments made to settle covered claims under the Gencon Policies, it would harm Gencon and result in additional damages as a consequence because Gencon would be without sufficient capital for other claims.

137.    Upon information and belief, Lexington and Westport knew at the time they entered into their respective Facultative Reinsurance Certificates that a wrongful refusal to reimburse settlement payments for a covered claim in full and in a prompt manner could harm Gencon.

138.    The consequential damages Gencon has suffered and will continue to suffer, including additional costs of securing its promised reinsurance, including, but not limited to, attorneys' fees and costs in association with this action, and needing infusions of money, were within the contemplation of the parties herein, at the time Lexington and Westport entered into their respective Facultative Reinsurance Certificates, as natural probable results of a breach of contract and were intended to be avoided and prevented by timely reimbursement of settlement payments made by Gencon under the Gencon Policies.

139.    WHEREFORE, Gencon is entitled to entry of judgment for breach of contract, including for breach of the covenant of good faith and fair dealing, and awarding the payment of damages in an amount no less than no less than $36,439,052.90 as to Lexington and

$19,002,272.74 as to Westport, pre-and post-judgment interest, consequential damages, and attorneys' fees and costs, each in amounts to be proven at trial, and together with such further relief set forth below.

## COUNT II
## DECLARATORY JUDGMENT
### (Obligation to Pay Defense Costs and Settlement Amounts)

140.    Gencon repeats and realleges paragraphs 1 through 139 as if fully set forth herein.

141.    Gencon seeks a declaratory judgment to determine a question of actual controversy among the parties regarding the respective Facultative Reinsurance Certificates.

142.    Lexington and Westport have refused to pay the full amount owed to Gencon under their respective Facultative Reinsurance Certificates for the defense costs incurred and paid by Gencon, and which Gencon will continue to incur and pay in connection with the Miracle Meadows Claims.

143.    Lexington and Westport have an obligation under their respective Facultative Reinsurance Certificates to pay for the full amount of defense costs Gencon paid to defend against the Miracle Meadows Claims.

144.    Lexington and Westport have refused to pay the full amount owed to Gencon under their respective Facultative Reinsurance Certificates for the losses incurred and paid by Gencon in connection with the settlements of the Miracle Meadows Claims.

145.    Lexington and Westport have an obligation under their respective Facultative Reinsurance Certificates to indemnify Gencon for loss incurred by Gencon in paying the settlements of the Miracle Meadows Claims.

146.    By reason of the foregoing, an actual and justiciable controversy exists between Gencon and Lexington and Westport regarding Lexington's and Westport's obligation to pay the

41

full amount of the incurred defense costs and settlement amounts for the Miracle Meadows Claims.

147.    WHEREFORE, Gencon seeks a judicial determination by this Court that Lexington and Westport are obligated under their respective Facultative Reinsurance Certificates to pay the full amount of defense costs and settlement payments paid and to be paid by Gencon for the Miracle Meadows Claims.

148.    Such a judicial determination is necessary and appropriate at this time under the circumstances alleged.

## **Prayer for Relief**

WHEREFORE, Gencon respectfully requests:

A.    Judgment against Lexington and Westport in an amount equivalent to all defense costs and fees and settlement amounts incurred and paid by Gencon in defending against the Miracle Meadows Claims (an amount no less than no less than $36,439,052.90 as to Lexington and $19,002,272.74 as to Westport), pre-judgment and post-judgment interest, as well as consequential damages, including attorneys' fees and costs;

B.    A declaration that Lexington and Westport must pay the full amount of the defense costs and settlement amounts Gencon incurred and paid and will incur and pay for the Miracle Meadows Claims;

C.    Costs, attorneys' fees, and expenses incurred by Gencon for this action;

D.    Pre-judgment and post-judgment interest, as provided by law; and

E.    Such other and further relief as the Court may deem just and proper.

DOCS-100882949.2

## Jury Demand

Gencon hereby demands a trial by jury on all counts so triable.

Dated:    February 3, 2026

ANDERSON KILL P.C.

By:   /s/ Marshall Gilinsky
       Marshall G. Gilinsky, Esq.
       Jerry S. Goldman, Esq. (*admission pending*)
       Dennis J. Nolan, Esq. (*admission pending*)
       Bruce Strong, Esq. (*admission pending*)
       Thomas Dupont, Esq. (*admission pending*)
       7 Times Square, 15th Floor
       New York, NY  10036
       Telephone:  (212) 278-1000
       Fax:  (212) 278-1733
       mgilinsky@andersonkill.com
       jgoldman@andersonkill.com
       dnolan@andersonkill.com
       bstrong@andersonkill.com
       tdupont@andersonkill.com

       *Attorneys for Plaintiff Gencon Insurance Company of Vermont*